Thank you, Your Honors. May I please reserve three minutes for rebuttal? Yes. Please try to keep track of your own time, but I will also try to do it. Okay. Thank you, Your Honor. May it please the Court. Good morning, Judge Reinhart, Judge Hugg, Judge Bybee. My name is Robert Spretnak, and with me in the courtroom is Amy Coburn. We are here on the matter of Coburn v. PN II, Inc. and Pulte Homes, Inc. We are here for a de novo review of a grant of summary judgment that was done in the district court level. The record is factually complex, but it is very clear that Ms. Coburn submitted sufficient evidence to be able to proceed to a jury trial. The prima facie case was clearly established because, first of all, we have evidence in the record that the decision to terminate Ms. Coburn was made simultaneously with the decision to terminate Cheryl Palmer, the Nevada-area president. Now, what was interesting about the Cheryl Palmer tenure heading the Nevada-area operations of Pulte Homes, Inc., which did business as a separate corporation, PN II, Inc. That's true. Your retaliation claim wouldn't have much merit. And as we said, those are pled in the alternative. Okay, go ahead. Because you don't know what the motivating factor is until all the evidence comes out at a trial and a jury tells you which one it is. But starting off with the Title VII unlawful sex discrimination claim, we have not only objective evidence that at the time that initial decision was made that Ms. Coburn was performing her job with excellent reviews, but at the time the second decision was made, she still was receiving excellent reviews on her objective criteria. Now, this Court, pretty much simultaneously with the briefing being done on this, maybe slightly before, in a very, very well-reasoned, well-written opinion in the matter of Nicholson v. Hyannis Eyre, laid out the standard for what matters is the objective standards when it comes to the prima facie case, not the subjective standards, because an employer who is bent on discriminating against somebody can always come up with subjective reasons and can always make an argument as to how somebody fell short of those subjective. But here we have objective evidence. We have a bonus being given of $250,000, putting Ms. Coburn's total compensation at close to half a million, but it was not only a significant bonus, it was over the budgeted amount. She was budgeted for a $200,000 bonus, but at the same time she's being told you don't have raving fans, she's being given an above-budget bonus. That is objective proof. The objective standards, she achieved her goals with, quote, flying colors. The decision-maker, Matt Court, co-decision-maker, actually, Matt Court was willing to say objectively, she achieved her objective goals with flying colors. That is sufficient to establish the prima facie case, which, as this Court is well aware, does not require sufficient evidence to be able to win at the trial. It's just sufficient evidence to survive summary judgment. Now, the employer has offered a legitimate nondiscriminatory reason, and that was she failed to have sufficiently detailed understanding of the minutiae in a manual that was never, ever produced in discovery, is not part of the record. Clearly, if that manual were so critically important. The other reason was that she lacked leadership qualities. Are you saying that you can't consider that at all? I say the jury can definitely consider that. But on summary judgment, you can't consider it? Summary judgment, you can consider it, but again, has Ms. Colburn offered sufficient evidence to overcome that? And in addition to, like I said, the objective criteria, if this had not been... What you're saying is we should look at both reasons they gave, the lack of leadership quality and the lack of familiarity with the manual. And that's their burden of production. There's no burden of proof on that. That's a mere burden of production. And we do not argue that they failed that burden of production. They most certainly did produce the burden. And if the lack of leadership were genuinely an issue, if this were not a working environment that was permeated with sex discrimination, what would we have seen? Okay? And we can look at the evidence and look behind it and compare what the world would have looked like had they been genuinely trying to work with Ms. Colburn. If Patrick Ault, who is beneath her in the chain of command, he's in the division and there's... I'm trying to find out about your argument. As to the subjective question, the lack of leadership, are you saying that a genuine issue of dispute is established simply by the other evidence of sex discrimination that throws that into question as whether that's a pretext? Whereas on the second question of lack of familiarity with the book or the guidelines or whatever they are, that that is thrown into question by several other objective factors, such as it was not mentioned as the reasons for discharge. I... That we should approach those two things on summary judgment? Well, when you've got the employer offering a legitimate non-discriminatory reason, it then goes to pretext analysis. And the question is whether or not the minutiae of the manual and the leadership questions were just a pretext for unlawful discrimination. Now, starting with St. Mary's Honor Center case, it's not up to Ms. Colburn as the plaintiff to have to You've got to raise the genuine issue of fact. We all understand that. Okay. And what are you saying raises a genuine issue of fact as to pretext? And the record is filled with evidence of pretext. The first is, and you can go back to some of the same evidence that was applicable on the Prima Facie case. Number one, Pulte wanted to fire Amy Colburn simultaneously with the firing of Cheryl Palmer. There's some self-serving statements after the fact from Sean Deaton that he mentioned the manual. Clearly, there's no discussion of leadership prior to that May 2005 decision. But if the manual minutiae really were an issue, shouldn't we be seeing in prior performance evaluations problems with the manual? The manual was not an issue at the time of that initial determination decision. Leadership was not an issue at the time of that initial determination decision. Is there a termination letter? No, that is strictly in the record from the affidavit of Cheryl. Oh, there's, I don't believe there's a termination letter in either case. Cheryl Palmer's affidavit testimony establishes the first termination decision, and then the second one, we've got the recording of the conversation. And again, no discussion about the minutiae of the manual in that lawfully recorded conversation, and no discussion of, you know, what could have been done to improve on the leadership criteria. But again, there's further evidence of just pretext than that. And we've got evidence of pretext being that of the seven women who were on the leadership team, the management team at Pulte, three were gone prior to Amy, three were gone after Amy. One of them arguably could be dean of promotion, but that wasn't the stereotypically female area of interior design. But the record is clear. All the women were gone. Patrick Byrne, when he held a meeting to lash out about the problems in Nevada and conceding that Cheryl Palmer, even though it was fired allegedly for, quote, performance problems, even though Nevada was the best performing area, he only brings the women who were present in Nevada for that meeting. Don Betcher, a man. John Kalin, a man. Dee McDonald, a man. None of them were in that meeting. Only the women were subject to his haranguing. How many of the women were replaced with female employees? Were any of the vice presidents replaced? Cheryl Palmer was replaced by Matt Cort, a male. Amy Coburn was replaced by somebody under her name. Norma Machado, who was taken out of the Nevada region immediately prior, was replaced by Gary, and her last name is escaping me, but that is in the record. I don't believe it's in the record who replaced Debra Blake or Michelle Ross, and then Lynn Glendo was a RIF, and I think that was a position that was eliminated. What about Janice Jones? That is also not in the record, but again, that one is more of a stereotypically female area. She was actually promoted rather than either demoted or fired or transferred. Promoted out of Nevada, though. Promoted out of the chain of command that involved Matt Cort and Patrick Byrne. Where was she moved? I think to the corporate And for purposes of surviving summary judgment, that's a distinction without a difference. But that's only one of the many factors in establishing pretext. And again, the issue with Cheryl Palmer being terminated allegedly for poor performance when Nevada was Pulte's top-performing region, and then the cognitive dissonance between getting great reviews and still being over budget on the problems after the first time they tried to fire Amy, they were told, oh, it's too soon. Well, suddenly in December, it's no longer too soon. Seven months had passed, and suddenly things start happening again. Now, one thing I briefly want to talk about also is the issue of retaliation. And it is a pleading in the alternative, like Judge Reinhart has pointed out, but there's two with the retaliation. Number one, the first time Amy complained to somebody about Patrick Byrne's harangue about the soap opera atmosphere, Amy Coburn clearly believed that to be a gender stereotype comment. Now, it only matters that she has that good faith belief. But what happened when she complained? Norma Machado says, I can't do anything about it. I've been discredited due to my tie to Cheryl Palmer. And sure enough, Norma Machado is gone before Amy is gone. She goes to Sean Deegan, and the district court pointed out Sean Deegan was a decision-maker involved in both the hiring and the firing. Well, there's an intervening factor in there, and she goes and makes the complaint about Patrick Byrne to Sean Deegan. What's Sean Deegan's response? You're supposed to say, thank you, sir, may I have another. That's the response. May I have another what? Paddling, I think. It's a reference to the movie Animal House. There's a scene in there where one of the fraternities is paddling the pledges, not very gently either, if I may add. And clearly, he was quoting from that line, although not in a joking manner. And then the next time a performance review was done after that, all of a sudden, Amy's performance was bad. Then she complains about the whiny bitches of Vegas comment, and she's put on the work plan. Now, there's some evidence maybe the work plan was prior, but if you accept that, then you're also accepting that the work plan was perfunctory, that she had already been fired at the time of the work plan. She was put on the work plan, but there was no termination until after she complained about the whiny bitches of Vegas comment by Steve Petruska, the COO and Cheryl Palmer's predecessor. So if you believe that the work plan that she was put on in February was merely perfunctory and she was going to be fired anyway, then that's another fact that backs up pretext. All right. You're going to have two minutes for rebuttal, if you want to. Okay. I'm going to reserve it this time, unless Your Honors have any other questions. I think you asked for three, but neither of us looked at three. So we'll give you two and a half. Thank you, Your Honor. Good morning, Your Honors. My name is Elena Ucha. I'm here on behalf of Pulte Holmes and PN2. By the way, Pulte Holmes was dismissed as a defendant in this case. So really, PN2 is the only actual defendant in the case. Your Honors, Ms. Coburn has the burden of providing sufficient evidence to overcome summary judgment, which of course was brought by PN2, by presenting evidence that would demonstrate a question of fact. Said alternatively, we have the burden of demonstrating no question of fact. How do you deal with the fact that she had gotten a raise and a large bonus not too long before and all of a sudden she is found to be unsatisfactory? Your Honor, there are several factors that counter that. The first complaint about Ms. Palmer was still employed. You will find that complaint at the supplemental excerpt of record at 143 through 145, in which an individual wrote about Ms. Coburn that she lacked common sense and that he had questions about her understanding and abilities in residential architecture. In June of 2005, before the bonus, there was a discussion about termination, and I want to go back to that because I think that completely undoes the retaliation claim, which plaintiff says occurred. Plaintiff offers that evidence. There was a question of termination in June of 2005 because she wasn't performing. In August of 2005, Matt Court writes an email. When did Ms. Coburn, when did the first boss leave? Ms. Palmer was terminated on June 17th of 2005, Your Honor. Okay. And then, so there were concerns about her before Ms. Palmer's termination. And when did she get the bonus? December of 2005. With respect to the bonus, Your Honor. But why would she get a bonus that is clearly substantial? It's far larger than her salary. And again, if Pulte already has or PN2 already has concerns about her and they have complaints that are going to become the basis for firing her, why do you give her a huge bonus? Because, Your Honor, there are two reasons. One is the bonus is based on the total volume of work that Pulte was doing. And this was a time in Nevada when the residential home market was exploding. Everybody got very large bonuses. But if you look at the record, Mr. Court explains that at excerpts of record at 133, he says he inherited that bonus, which was put into the He also inherited Ms. Coburn's expectation based on a verbal promise by Ms. Palmer to pay the additional amount. Ms. Coburn testifies to that. Mr. Court testifies to that. Mr. Deegan testifies to that. Why isn't the fact that the salary increase and the bonus such a short time before she was found to be incompetent, why doesn't that raise a question of fact that would prevent some adjustment? With respect to the increase, that was done by Ms. Palmer for 2004, about 16 months before she was terminated. So that's a substantial period of time, Your Honor. And so during that 16 months, she became incompetent, huh? I don't think that Pulte ever said she was incompetent, Your Honor. I think what Pulte said is that she lacked leadership and knowledge about architectural residential architecture. But even Okay. So those are the reasons. Between that 16 months, all of a sudden she lacked leadership that they had rewarded her for before. She was employed a very short time before. Could you explain the 16 months? Yes. She got her she got a raise in 2000 at the end of 2004 for and she'd been there months. The bonus was in 2004? No, no. A raise, Your Honor. She got the raise that Judge Hugg was asking me about. She got a $50,000 raise. I believe Judge Hugg was asking me about the raise first. That happened in 2004 when she'd been there seven months. Then she gets a bonus in December of 2005, Your Honor. That's true. And in 2005. The bonus was six months before she was four months before she was fired. And would they have given her a bonus of that size if she were and did not have any leadership qualities? Yes, Your Honor. Because the bonus was mathematical and already promised. And as Mr. Mr. Court explained, they wanted to give her a bonus in good faith as a sign they wanted her employment relationship to work. Mr. Deegan and Mr. Court agreed to meet what Ms. Coburn's expectations were based on what Ms. Palmer had promised her. If they had not given her the bonus, we'd be here on a different theory. What what is the timing on the on the evaluations? When were the evaluations conducted? There's only one evaluation at issue, Your Honor. And it's delivered on December 19th of 2005 by Mr. Deegan. So it's a it's contemporaneous with the with the bonus. It is, Your Honor. Okay. And the evaluation was favorable. The valuation was below expectations. I thought there was one before that she had met all of her goals. Ms. In December of 2000, there's a there's an evaluation by Ms. Palmer, which is not in the record in 2004. For 2005, the only the only actual evaluation she gets is a is a two, which is below expectations. What the conversation is about is on December 5th before the bonus is delivered before excuse me, the evaluation is delivered. There is an email from Matt Court to Ms. Coburn in which he says several things. One thing he says is that she has met her objective goals with flying colors. And that's in December of 2005. That's correct. That's not the evaluation. It's an email that predates the evaluation by two weeks. He also says in that email, which is left out, that the I'm sorry, the architectural department would run just as well without her. So he writes an that's necessary to the company. No, that's different from but that's but that's different than than saying that somebody is performing below expectations or performing poorly. Well, you have a department that was just so well run by other folks or it was so independent of other tasks that she had. Architecture wasn't the only thing that she had as a responsibility. I'm not sure I understand your question, Your Honor. I don't think architecture was not her sole responsibility, right? I don't know the entire scope of her responsibility, but her primary responsibility was to oversee and deliver architectural drawings and make the architecture for the residential homes work within the Pulte scheme. The way I see it, you may be able to explain in a trial the reasons why, given these evaluations and the bonus and so forth, but I can't see how you can at a summary judgment say there is no question of fact and thus we don't go to trial. Can I point out to the court some undisputed facts here? You know, to say this department can run without you, well, without you, it seems to me could be a compliment. You know, you've done such a good job with this department. You know, you've got him running perfectly. If you read the email, Your Honor, I think, which is in the record, I think you would see that it was not a complimentary statement. Plus, in August of 2005, Matt Court also wrote an email where he evaluated everybody under his new charge. Ms. Coburn is there, and he says there are issues with her performance, but he hopes they'll be worked out by some reassignments. Can we look at the fact that Mr. Deegan both hired and was and terminated? No, but there's a dispute about that. There's some evidence in the record that the I think Mr. Deegan or somebody said it was really done by Ms. Palmer. No, Ms. Palmer and Mr. Deegan. I know they were in one view of it, they shared the responsibility. And another, it was really done by Ms. Palmer. The hiring, Your Honor? Yeah. I did not find that, but I will defer to you. I can also say that Mr. Deegan and Ms. Palmer terminated a man, Mr. Trueblood, who was replaced by Ms. Palmer. So they terminated a man and replaced that man with a woman. Sorry, Ms. Coburn, not Ms. Palmer. Ms. Coburn. Mr. Trueblood was terminated for performance reasons. Those you'll find at the supplemental excerpt of record at 13. At the same time that Ms. Coburn was given a below expectations evaluation, Mr. Deegan gave another vice president in Arizona, John Wood, a below expectation rating, and that is at the supplemental excerpt of record at 33. Is there anything in writing anywhere as to why she was terminated? There is not a termination letter, Your Honor, with an explanation on it, no. And so the only explanation is what happened in the meeting that she had? The only explanation, I think, comes from testimony, which is disputed as to why. I mean, clearly, Ms. Coburn believes it's because she's a woman, and Mr. Deegan She's not going to say that they told her it was because she was a woman. Her testimony gives the reasons that she believes she was told or that she's testifying she was told. And, yes, Your Honor, I guess I was summarizing, but, you know, in the end, what she's saying is these are not legitimate reasons, and it was really because She has a version of what reasons were given to her. And in the opening brief, they talk only about Not in the brief. Is there an affidavit, a deposition? What does she say were the reasons she was told? Uh, in her deposition, Your Honor, she says it's because I'm a woman. No, she wasn't told it's because she's a woman. But you're asking me what she said in her deposition? As to what she was told in the meeting. She lacked leadership, Your Honor, that there was a failure of leadership. And nothing was said about the lack of knowledge about this book. There isn't a there isn't any deposition testimony that says here is the conversation that occurred at my termination. So I would be inferring as the court would have to infer the information leading up to it is repeatedly leadership, leadership, leadership, and the lack of architectural knowledge. And that is in the record. But I I'm sorry, Your Honor. I can't point to something where you could read what was said to her. But wouldn't there be a question of fact as to whether she showed lack of leadership? You, Your Honor, I think the court isn't here to sit as a super personnel department. So unless the court believes there's a reason to doubt that that was true, even though it's repeated to her starting back in May of 2005. We're not trying to serve as a super personnel department. We're trying to find a question of fact. I understand, Your Honor, and I I understand that that there are compelling facts here on which you have focus. I'd like to focus on a few others. For example, what I believe is misrepresentation of fact regarding seven employees. Miss Palmer and Miss Coburn were terminated. But nobody else, not another woman was terminated from that department. And there is no evidence to the contrary. There's inference in her belief, but there is no evidence. Miss Ross resigned. There is not one shred of evidence, no place in that record will you find the reason. Why isn't an inference something that can be taken into consideration? Oh, it absolutely can, Your Honor. It has to be a reasonable inference, but absolutely an inference can be made. But if a department went from seven women to zero, for instance, whatever reason, it would be something to consider. I think if there were evidence to give you some basis to believe that. Even if the women just fled the department. I don't think that you can reasonably assume that they all fled because there was a hostility to women without knowing some, having some basis to believe that. But it's a question that would be determined at trial, would it not? There are questions that have to be determined at trial. If you look at Miss Blake's affidavit, though, which is a supplement. If I can stop you there. If there are questions that have to be determined at trial, summary judgment shouldn't be given. Your Honor, I don't believe there are sufficient questions. Not every question must be determined at trial. I don't believe the summary judgment standard is that absolutely every question must be resolved in order for summary judgment to be granted. Material issues. They must. You've only got a minute left, so give us anything that you haven't had a chance to say. Let me just turn to retaliation very quickly because we don't have statements in the alternative. We have a contradiction. On page seven of the plaintiff's brief and repeatedly said here today, they make the point that Miss Machado said in June of 2005, Miss Palmer was scheduled to be terminated. Miss, I'm sorry, Miss Coburn was scheduled to be terminated. In their brief, they argue if that fact is true, they have no retaliation claim. That said, at page 56, you can't present contradictory evidence on the same fact, ask the court to believe this fact for purposes of discrimination, but then disregard it for purposes of retaliation. That the court can't do. I can't. If you go to the jury and say, we think we got laid off, we think they were going to fire us. The jury says, well, I don't think that's true. I don't accept that. And then, well, then you say, if that's not the reason, then here's the reason. Your Honor, Pulte did not present that evidence. Miss Palmer propounds that evidence. Miss Coburn, I apologize. Miss Coburn propounds that evidence. It's Miss Coburn who says it's true. It's Miss Coburn who elicits that testimony. It's Miss Coburn who presents an affidavit from that point of view. The jury says, well, that's not enough to convince us. Maybe you're right, but it's not enough to convince us. I don't believe it. You say you can't do it in the alternative. You can't present contradictory evidence to create a question of fact. That's what I'm saying. It's not really contradictory to say, here are reasons we think it was done before. If you're not convinced that it was done before, here are reasons why it was done again. I think, Your Honor, that a plaintiff cannot say, I was going to be fired in June, and then say later in the brief, if you believe that, I lose on my retaliation claim. But don't believe that, even though I believe it. I don't think a plaintiff can say that, Your Honor. Okay. Thank you. Very quickly, we can say that, Your Honor. And the reason we can is because we know that the statement was made to her. We don't know whether they genuinely were going to fire. We just know that she was told that they were going to be fired. Maybe they genuinely changed their mind because of Norma. I don't think so. But I'm not the fact finder. It's the jury that's the fact finder. And that's why it's acceptable for us to plead that in the alternative. I want to point out, if a member of a protected class is having trouble being accepted by her peers in a home building industry, which is really, it's a man's world. And a person is having trouble being accepted by her peers and not getting the respect of people like Alan Lang or Patrick Alds, the should-be underlings. It's not the role of this court to blame the victim. If the company were genuine. We're not supposed to be a super employer. We're not supposed to blame the victim. What can you do today? Well, what you can do today is reverse and remand, because it is up to the jury to decide. If the evidence, what you would expect, if she were genuinely having problems with these people, why not bring her into a meeting with Alan Lang to work out the problem? Why not bring her into a meeting with Patrick Alds, who kept refusing to meet with her? There's no evidence in the record that Patrick Alds was ever disciplined for treating Amy with disrespect, yet somehow this is a lack of leadership. Now, we do have in the record the reason for her termination. It's the meeting that she lawfully recorded because she knew that her employer was going to somehow try to come up with some other reasons for it. And the record of the employer's reasons is clear. I was expecting more, is what Matt Court says. Late in the meeting, there's a discussion about showing some leadership. It's not a, you failed to show leadership when this happened. Instead, we also have in the record, page 267, Matt Court. Perfect focus for you, Amy. Thanks for the leadership. Again, mixed signals. Mixed signals means disputed issue of fact. Disputed issue of fact means it's a question for the jury. When was thanks for the leadership? What date was that? February 16, 2006. Well, thanks for the leadership. Goodbye, Matt. And thank you for allowing me to argue this case, Your Honor. Goodbye. Thank you both very much. Case just arguably submitted.
judges: Hug, Reinhardt, Bybee